IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERBY CONLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 05-0322 ERIE |
| | ) |
| CITY OF ERIE, PENNSYLVANIA, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM and ORDER

Gary L. Lancaster,
District Judge.                                    September 25, 2007

This is an action in employment discrimination. Plaintiff,
Erby Conley, claims that the City of Erie, Pennsylvania
discriminated against him due to his race in violation of Title
VII of the Civil Rights Act of 1967, 42 U.S.C.A. § 2000e.
Specifically, plaintiff contends that the City eliminated his
position of Public Safety Director because he is African-
American.   Before the court is defendant's motion for summary
judgment [doc. no. 44]. Because we find that plaintiff is not an
employee under Title VII, defendant's motion will be granted.

I.   FACTUAL BACKGROUND[1]

The general factual background of this case has been summarized in two prior opinions issued by another Judge of this court [doc. nos. 16 and 30]. We concentrate here on the facts relevant to the pending motion for summary judgment.

The Mayor of the City of Erie, Pennsylvania reinstated the position of Director of Public Safety in 2002 to fulfill his campaign promise to more closely supervise and manage the Erie Police and Fire Departments. Prior to that time, the position had remained vacant for nearly thirty years. Joseph Weindorf was the first person to hold the reinstated position. When Mr. Weindorf failed to perform the job to the satisfaction of the Mayor, the Mayor fired him. Thereafter, the Mayor appointed plaintiff to the position of Public Safety Director. Plaintiff was appointed on January 12, 2004. The Erie City Council did not formally approve plaintiff's appointment until September 9, 2004. However, in the interim, plaintiff performed his duties for the Mayor.

The Director of Public Safety oversaw the Police and Fire Departments. Plaintiff was one of only four Directors in the City government. The Directors were directly below the Mayor in

---

[1]   The following facts are undisputed, unless otherwise indicated. We construe the other facts in the light most favorable to plaintiff, the non-moving party.

2

the chain of command.  Plaintiff reported directly to the Mayor.
Plaintiff met with the Mayor on a daily basis, averaging about 20
meetings per week.  Both the Mayor, and plaintiff himself,
considered the Director of Public Safety to be part of the
Mayor's "cabinet."  In that capacity, plaintiff participated in
weekly policy meetings with the Mayor and his other top advisors.

As Director of Public Safety, plaintiff established
promotional, diversity, and entrance standards for the Police and
Fire Departments.  He set up a towing committee.  Plaintiff took
part in budgeting and labor negotiations for these departments.
He drafted a mission statement for his office.  Plaintiff had the
authority to fire employees, grant leaves of absence, and restore
an employee to a position from which he or she resigned.
Plaintiff supervised nearly 400 employees.  Plaintiff was exempt
from the civil service laws.

In December of 2004, the Erie City Council passed the 2005
fiscal year budget.  That budget did not provide funding for the
Public Safety Director's office.  The four members of the City
Council who voted to eliminate the financing stated that they did
so because the office was not necessary, especially in light of
the financial problems being experienced by the City at the time.
Plaintiff's job, and his secretary's job, were eliminated.

3

Although the City's budget no longer provided financing for plaintiff's position, the Mayor asked plaintiff to continue working. It was the Mayor's belief that the City could, and would, pay plaintiff from other sources. However, the City Council refused to authorize countersignature of plaintiff's payroll checks. The Mayor sued the City Controller to force signature of plaintiff's payroll checks. However, the Court of Common Pleas of Erie County, Pennsylvania upheld the City's refusal to pay plaintiff. Plaintiff stopped reporting to work on June 30, 2005. He worked from January 1, 2005 until June 30, 2005, without pay, at the personal and direct request of the Mayor.

## II. STANDARD OF REVIEW

Fed.R.Civ.P. 56© provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather must go beyond the pleadings and present "specific facts showing that there is a genuine issue

4

for trial." Fed. R. Civ. P. 56(e).

The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. A dispute over those facts that might affect the outcome of the suit under the governing substantive law, i.e. the material facts, however, will preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Similarly, summary judgment is improper so long as the dispute over the material facts is genuine. Id. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. Id. at 248-49. Under these standards, the non-moving party must do more than show there is "some metaphysical doubt" as to the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Although inferences must be drawn in favor of the non-moving party, "an inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990). Similarly, the non-moving party cannot rely on unsupported assertions, conclusory

5

allegations, or mere suspicions in attempting to survive a summary judgment motion. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)); see also Lujan v. National Wildlife Fed., 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit").

The non-moving party has the burden of producing evidence to establish each element of her claim. Celotex, 477 U.S. at 322-23. The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which she bears the burden of production. Anderson, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec., 475 U.S. at 587 (citations omitted).

In summary, the inquiry under a Rule 56 motion is whether the evidence of record presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute or whether the evidence is so one-sided that the movant must prevail as a matter of law because no reasonable jury could return a verdict in her favor.

6

III. DISCUSSION

Plaintiff alleges that the City of Erie, Pennsylvania engaged in race discrimination, in violation of Title VII, 42 U.S.C.A. § 2000e.[2]   Title VII protects employees against discrimination in the workplace on the basis of race, or other protected characteristics.   42 U.S.C.A. § 2000e-2(a)(1). However, Title VII excludes from its protections certain workers. Two such exclusions are determinative of this case.   Section 2000e(f) provides that:

> the term "employee" shall not include any person
> elected to  public office...or any person chosen
> by such officer to be on such officer's personal
> staff, or an appointee on the policy making level

42 U.S.C. § 2000e(f).  These exemptions, commonly referred to as the "personal staff" and "policy making" exemptions, are to be narrowly construed.   Constenbader-Jacobson v. Commonwealth of Pennsylvania, et al., 227 F.Supp.2d 304, 309 (E.D. Pa. 2002). Federal law controls whether plaintiff qualifies as a covered employee under the terms of Title VII.   Id.   However, we may look to state law to determine a person's duties, and how he is hired and fired.   Id.

_____

[2]     Plaintiff has also brought a pendant PHRA claim.  A
        PHRA  claim is construed consistently with a Title VII
        claim.   Our ruling on the Title VII claim, therefore,
        also disposes of the PHRA claim.  Kelly v. Drexel
        Univ., 94 F.3d 102, 105 (3d Cir. 1996).

Although the exemptions are highly fact dependant, summary judgment may be appropriate when there is no genuine issue of material fact as to the applicability of the relevant factors. Birch v. Cuyahoga County Probate Court, 392 F.3d 151, 158 (6th Cir. 2004). Here, it is undisputed that the Mayor was an elected official, and that plaintiff was not subject to the civil service laws.    Therefore, the only question is whether plaintiff's position as Public Safety Director satisfies either the "personal staff" or "policy maker" exemption, as a matter of law.  Because there is no genuine issue of material fact as to this question, we are able to make this determination on a motion for summary judgment.

### A.    The Personal Staff Exemption

Defendant contends that plaintiff was a member of the Mayor's personal staff, and, as such, is exempt from the protections of Title VII.  Plaintiff denies that he held such a position.  We find, as a matter of law, that plaintiff was a member of the Mayor's personal staff under the applicable standards.

The personal staff exemption was added to section 2000e of Title VII in order to "exempt from coverage those who are chosen by...the elected official..and who are in a close personal

8

relationship and an immediate relationship with him.  Those who are his first line advisers."   118 Cong. Rec. 4492-93 (1972) (comments of Sen. Ervin, sponsor of the amendment adding the exemption).   The statute and the legislative history do not define who is a member of "such officer's personal staff". Furthermore, the Court of Appeals for the Third Circuit has not set forth what standards courts within its jurisdiction should use in determining whether this exemption applies.

However, both parties cite to <u>Teneyuca v. Bexar County</u>, 767 F.2d 148 (5th Cir. 1985) as setting forth the factors we should consider in deciding whether plaintiff falls within the personal staff exemption.   The Court of Appeals for the Fifth Circuit compiled these factors from opinions issued by the Courts of Appeals for the Fourth, Eighth, Ninth, and Tenth Circuits. <u>Teneyuca</u>, 767 F.2d at 151.   The factors include: (1) whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the

9

elected official and the person filling the position.  <u>Id</u>. at 151.   The <u>Teneyuca</u> factors are still recognized as the leading statement of the law regarding the personal staff exemption.   <u>See</u> <u>e.g.</u>, <u>Birch v. Cuyahoga County Probate Court</u>, 392 F.3d 151, 158 (6th Cir. 2004); <u>Saddler v. Quitman County School Dist.</u>, 2007 WL 2287838, *3 (N.D. Miss. Aug. 03, 2007).   The focus of these factors is on whether the employee worked in an intimate and sensitive position of trust, close to the elected official. <u>Cromer v. Brown</u>, 88 F.3d 1315, 1323 (4th Cir. 1996).

Upon consideration of these factors as applied to the facts of this case, we find, as a matter of law, that plaintiff is exempt from Title VII as a member of the Mayor's personal staff. We consider each of the <u>Teneyuca</u> factors in turn, while remaining flexible in our approach to ensure that we are determining, more generally, whether plaintiff worked in an intimate and sensitive position of trust with the Mayor.

The Mayor of Erie has plenary powers of appointment and removal over the Director of Public Safety.  The facts leading to this conclusion are not in dispute.   The Mayor reinstated the Director of Public Safety position, after a thirty year vacancy, in order to fulfill a campaign promise.   The Mayor fired plaintiff's predecessor because the Mayor was dissatisfied with his work.   Thereafter, the Mayor appointed plaintiff to the job.

10

The Mayor personally selected plaintiff for the job in order to "shake things up." The Head of Human Resources was the only other person to interview plaintiff.

That City Council approval was required for the appointment does not change the result. That approval was a formality, as evidenced by the fact that plaintiff performed his duties for the Mayor without Council's approval for more than nine months. Moreover, after Council eliminated the funding for plaintiff's office, he continued to work, without pay, for more than six months, at the personal and direct request of the Mayor. Although plaintiff is correct that the Mayor was ultimately not able to obtain payment for plaintiff during this time period, tellingly, the Mayor was able to get plaintiff to continue working for him for several months, even without pay. It was the Mayor who interviewed, hired, worked with, and directed plaintiff, not the City Council.

Plaintiff was personally accountable to the Mayor. Plaintiff reported directly to the Mayor [doc. no. 47, ¶ 3]. In fact, the Erie City Ordinances creating the Director of Public Safety position explicitly subject plaintiff to the supervision and control of the Mayor. Erie City Ordinance §§ 117.01 and 117.03.

Even were we to accept plaintiff's allegation that he

11

sometimes reported to Ms. Mengine, the Mayor's assistant, this would not have a determinative effect on our analysis [doc. no. 47, ¶ 10(I)]. It is not remarkable that plaintiff had to, at times, go through the Mayor's assistant to get to the Mayor. That is simply a function of a busy, high-level government office that must deal with a myriad of issues on a daily basis. What is determinative is that plaintiff did not report to anyone outside of the Mayor's office. This fact cannot be disputed.

Plaintiff's position did represent the Mayor in the eyes of the public. Plaintiff represented the City at public meetings, and, at times, was the acting Mayor of the City, as were all Directors. Plaintiff met with various citizens groups on behalf of the Mayor. He participated in budget and labor negotiations regarding the Police and Fire Departments. At least as far as the Police and Fire Departments were concerned, plaintiff was the representative of the Mayor in the eyes of the public.

The Mayor exercised considerable control over the Director of Public Safety position. As discussed above, the Erie City Ordinances themselves provide for this control. In practice, although plaintiff was given the freedom any professional would need to carry out his day-to-day duties, ultimately, plaintiff's actions and policies were subject to the Mayor's approval and control. This is perhaps best demonstrated by noting that when

12

the Mayor was not satisfied with the performance of plaintiff's predecessor, he fired him.  Moreover, plaintiff reported to the Mayor on a daily basis, and participated in weekly meetings with the Mayor's top advisors.   The Mayor was plaintiff's direct supervisor.

Along these lines, there is no dispute that plaintiff held a position high within the chain of command.  He was one of only four people holding Director positions in the City government. The Director positions were immediately below the Mayor in the chain of command.  Plaintiff supervised hundreds of employees in the Police and Fire Departments, and established procedures, policies, and protocols for them.  He had the authority to fire employees.  On this record, there is no dispute that plaintiff ranked high in the chain of command.

Finally, the working relationship between plaintiff and the Mayor was very close.  They met informally several times a day. Plaintiff participated in policy meetings with the Mayor, and his other closest advisors, on a weekly basis.  Plaintiff acted as the Mayor's liaison to the Police and Fire Departments.   The position allowed the Mayor to have a level of oversight over the operations, finances, and costs of these departments that the Mayor could not personally provide [doc. no. 47, ¶ 4].  Plaintiff took issues raised by the Police and Fire Chiefs directly to the

13

Mayor [doc. no. 47, ¶ 9]. Although plaintiff may not have had the authority to unilaterally implement any and all changes in policy, he participated personally and directly with the Mayor in formulating and enforcing policies for the Police and Fire Departments. Plaintiff himself acknowledges that the Mayor relied on him to answer questions and address issues regarding these departments. Plaintiff was the Mayor's first line advisor as to the Police and Fire Departments. There can be no dispute that plaintiff worked personally with the Mayor to formulate and implement the objectives and goals of the Mayor's office.

Analyzing these factors, and focusing on the more general question of whether plaintiff worked in an intimate and sensitive position of trust and responsibility close to the Mayor, we find that plaintiff is exempt from coverage under Title VII because he was a member of the Mayor's personal staff.

### B.  The Policy Making Level Appointee Exemption

Defendant also, and alternatively, contends that plaintiff was an appointee on the policy making level, and, as such, is exempt from the protections of Title VII. Plaintiff denies that he held such a position. We find, as a matter of law, that plaintiff was an appointee on the policy making level.

14

As with the personal staff exemption, section 2000e(f), and its legislative history, do not define who is an appointee on the policy making level. And, again, the Court of Appeals for the Third Circuit has not set forth what standards courts within its jurisdiction should use in determining whether this exemption applies.

However, both parties cite to <u>Constenbader-Jacobson v. Commonwealth of Pennsylvania</u>, 227 F.Supp.2d 304 (E.D. Pa. 2002) as setting forth the factors we should consider in deciding whether plaintiff falls within the policy making exemption. In that case, the District Court collected cases from various Courts of Appeals in arriving at a list of relevant factors. These factors are: (1) whether the appointee has discretionary rather then solely administrative powers, (2) whether the appointee serves at the pleasure of the appointing authority, (3) whether the appointee has "meaningful input into governmental decision making on issues where there is room for principled disagreement on goals or their implementation," or, put another way, whether the appointee formulates policy, (4) whether the appointee is empowered to act and speak on behalf of a policymaker, particularly an elected official, and (5) whether the appointee is exempt form civil service protection, controls other employees, and has some technical competence or expertise. <u>Id</u>.

15

at 309.

Upon consideration of these factors, we find, as a matter of law, that plaintiff is exempt from Title VII as an appointee on the policy making level.

Plaintiff did not exercise solely administrative powers. There is no dispute that some of plaintiff's powers were administrative. However, there is also no dispute that many of plaintiff's powers were discretionary. He formulated diversity and entrance standards, and wrote mission statements. He brought policy proposals to the Mayor from the Fire and Police Chiefs. He crafted budgets, and participated in citizen meetings and labor negotiations. Plaintiff's duties cannot be described as solely administrative.

As discussed above, plaintiff served at the pleasure of the Mayor. The Mayor selected plaintiff for the position personally. Plaintiff worked at the Mayor's request, without pay, for several months. When plaintiff's predecessor was not doing the job to the satisfaction of the Mayor, the Mayor fired him. The ordinances creating the position explicitly state that the Director serves at the pleasure of the Mayor. There is no dispute that the Public Safety Director served at the pleasure of the Mayor.

16

Plaintiff had meaningful input into formulating policy. Again, we discussed many of the facts relevant to this factor above. Plaintiff participated in weekly policy meetings between the Mayor and his closest advisors. He brought policy recommendations to the Mayor from the Chiefs of Police and Fire. He drafted mission statements, established standards for the departments, and implemented programs and committees.

Plaintiff was empowered to act and speak on behalf of the Mayor. Several times, plaintiff was the acting Mayor. Plaintiff represented the Mayor's office at citizen meetings and in union negotiations. When plaintiff's predecessor refused to act and speak on behalf of the Mayor, the Mayor fired him.

And finally, plaintiff was exempt from civil service protection, supervised nearly 400 employees, and had technical expertise in police matters. These facts are not in dispute.

Based on the totality of the factors, we hold that plaintiff is exempt from coverage as an appointee on the policy making level.

IV.   <u>CONCLUSION</u>

Because plaintiff is exempted from Title VII's definition of an "employee," we grant defendant's motion for summary judgment. An appropriate order follows.

17

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERBY CONLEY,                          )
                                      )
          Plaintiff,                  )
                                      )
     v.                               )  Civil Action No. 05-0322
                                      )
CITY OF ERIE, PENNSYLVANIA,           )
                                      )
          Defendant.                  )


ORDER

     AND NOW, this 25 day of September, 2007, IT IS HEREBY

ORDERED that defendant's motion for summary judgment [doc. no.

44] is GRANTED.   Judgment shall be entered in defendant's favor

on Count I and Count II of the Second Amended Complaint.

     The Clerk of Court is directed to mark this case closed.


                              BY THE COURT:


cc:  All Counsel of Record


18